

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

### NO. PD-0290-23

### TAREQ ALKAYYALI, Appellant

### v.

### THE STATE OF TEXAS

### ON STATE'S PETITION FOR DISCRETIONARY REVIEW
### FROM THE SECOND COURT OF APPEALS
### TARRANT COUNTY

**PARKER, J., filed a dissenting opinion.**

### DISSENTING OPINION

The plurality opinion frames the question in this case as whether egregious harm occurs if the jury charge "fails to require the State to prove every contested element of an offense beyond a reasonable doubt." But that is not the correct question in this case. Here, the jury charge in fact required the State to prove *every* element of the offense of murder beyond a reasonable doubt—in abstract instructions. What the jury charge failed to do was include one of the elements—causing death—for one of the theories of murder in an application paragraph. Because Appellant did not

object at trial, the question is whether this omission from the application paragraph resulted in egregious harm.[1]

And the answer to that question is a resounding "no." As the plurality opinion acknowledges, "egregious harm" is a difficult standard to meet.[2] The record must show actual and not merely theoretical harm, and the defendant is harmed only if he "did not receive a fair and impartial trial."[3] Two independent reasons exist for concluding that the record does not show egregious harm. First, given the abstract murder instruction, other jury instructions, the prosecutor's comments, what people generally know about the offense of murder, and the jury's failure to exhibit any confusion, the jury in this case must have known that the State had to prove that Appellant caused the victim's death. Second, even if the jury had limited itself to the application paragraph and the evidence—determining whether, at the time of the collapse that led to the victim's death, the defendant had intentionally engaged in strangulation or suffocation activity that created a substantial risk of death—the jury must have found causation anyway. In addition to those two reasons, the jury's punishment-stage note to the trial court about the "sudden passion" special issue further reinforces a conclusion that the jury must have found causation at the guilt stage. Any harm suffered by Appellant was at best theoretical, not actual, and we should affirm his conviction.

**A. <u>General Observations</u>: The cases the plurality relies upon are not on point and reflect an incorrect framing of the issue.**

---

[1] *See Reed v. State*, 680 S.W.3d 620, 625-26 (Tex. Crim. App. 2023); *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1985) (op. on reh'g).

[2] *Sandoval v. State*, 665 S.W.3d 496, 528 (Tex. Crim. App. 2022) (quoting *Marshall v. State*, 479 S.W.3d 840, 843 (Tex. Crim. App. 2016)).

[3] *Reed*, 680 S.W.3d at 626.

To support its conclusion that the omission of an element causes egregious harm if the evidence on the element is contested, the plurality relies upon four Texas cases and indirectly relies upon two Supreme Court cases. In all but one of these cases, the element was *completely* omitted from the jury charge. In *Niles v. State*, the jury charge completely omitted any reference to the victims being public servants.[4] In *Ruiz v. State*, the abstract and application paragraphs for the offense of murder completely omitted the implied element of the absence of sudden passion, a mitigating element of the then-lesser-included offense of voluntary manslaughter.[5] In *Sanchez v. State*, this Court had construed the sexual harassment part of the official oppression statute to require that all acts of sexual harassment be "unwelcome," but the abstract and application paragraphs in the jury charge did not conform to that construction, so that the element of "unwelcome" was completely

---

[4] 555 S.W.3d 562, 567 (Tex. Crim. App. 2018) (regarding the missing "public servant" element: "Unfortunately, the jury charges did not ask the jury to determine whether Keelen and Haygood were public servants. Though there were separate written charges for each count, the judge read the two as a combined charge out loud. Neither the accusation nor the application paragraph included the public servant element. And the words 'public servant' do not appear anywhere in the middle of the charge.").

[5] 753 S.W.2d 681, 687 (Tex. Crim. App. 1988) ("However, it must be remembered that the charge omitted sudden passion as an element of murder. If the jury followed the law as set forth in the charge—as we must presume they did—they could quite reasonably have decided that they could convict appellant of murder without deciding, or even addressing, sudden passion."). *See also id.* at 682 & n.1 (setting out abstract and application instructions on murder and voluntary manslaughter). Although the voluntary-manslaughter instructions contained the element of sudden passion, the jury instructions required the jury to decide the issue of murder before getting to voluntary manslaughter, so the jury would never have to reach the issue of sudden passion. *See id.* at 682, 687. Despite what it saw as the complete omission of the implied element of lack of sudden passion, the Court also pointed to the other facts tending to show harm: that the jury initially returned a verdict on voluntary manslaughter (which did not hold up under jury polling), that the jury later sent a note asking about the relationship between murder and voluntary manslaughter (which the trial court answered by merely referring the jury to the charge), and that the evidence of sudden passion was "substantial." *See id.* at 685-86.

omitted for certain methods of committing the offense.[6] In *Apprendi v. New Jersey*, the hate-crime enhancer was a punishment issue to be decided by the trial court and thus not subject to being submitted to the jury.[7] And in *Neder v. United States*, the element of "materiality" was decided by the trial court and not submitted to the jury.[8] All of these cases addressed the *complete* omission of an offense element from the jury charge and, therefore, differ dramatically from the present case.[9]

The case the Court relies upon that does not involve the complete omission of an element, *MacDougall v. State*, involved the complete omission of a definition.[10] The Court nevertheless suggests that *MacDougall* is analogous to the present case. But, in *MacDougall*, the error was *preserved*, and the error was evaluated under the "some harm" standard for preserved error, not the

---

[6] 209 S.W.3d 117, 122 (Tex. Crim. App. 2006) ("The jury charge abstractly defined sexual harassment in the same ambiguous terms that the statute utilizes. Thus, it did not clearly inform the jury that it must find that, not only the appellant's 'sexual advances,' but also his 'requests for sexual favors, or other verbal or physical conduct of a sexual nature,' must be 'unwelcome' in order to support a guilty verdict. Moreover, nowhere does the abstract portion of the jury charge inform the jury that it must find that the appellant was aware that any of his sexual conduct was unwelcome. These are elemental facts. The application paragraph of the jury charge does nothing to ameliorate these deficiencies.").

[7] 530 U.S. 466, 491-92 (2000) (New Jersey law prescribed that a hate-crime enhancement that raised the punishment range for the offense be decided by a trial judge at the punishment stage instead of by a jury at the guilt stage.).

[8] 527 U.S. 1, 6 (1999) ("Materiality" element of the offense was not submitted to the jury; in fact, jury was instructed that it "is not a question for the jury to decide.").

[9] The cases also differ from the present case in other significant ways. In *Ruiz*, the Court did find egregious harm, but it did so by also finding the evidence of sudden passion to be "substantial," pointing to an initial jury verdict on voluntary manslaughter (that did not hold up to jury polling), and pointing to a jury note specifically about the interaction between murder and voluntary manslaughter.

[10] 702 S.W.2d 650, 651-52 (Tex. Crim. App. 1986) (op. on Appellant's mot. for reh'g) (definition of "deception" omitted entirely from the jury charge).

"egregious harm" standard for unpreserved error.[11]  In the present case, error was *not preserved*, so even if the facts in *MacDougall* were on all fours with the facts of the present case (which they are not), the difference in the harm standards could very well dictate a different result.

> **B. Reason 1: Given the jury charge, the State's comments, and what people know about murder in general, the jury must have understood that the State had to prove causation.**

This Court has previously made the general statement that the application paragraph is the "heart and soul" of the jury charge.[12]  But that general statement of law should not blind us to the realities of a particular jury charge.  Sometimes, an error in an application paragraph is not significant, when one looks at the jury charge as a whole.[13]  A review of the entire guilt-stage jury charge and other factors shows that the jury would necessarily have focused on and given effect to the abstract murder paragraph, with its requirement that causation be proven for both theories of murder.

> **1. *The abstract murder paragraph was prominent and easy to read, and it clearly required proof of causation.***

In the second paragraph of the jury charge, the trial court instructed that it would give some

---

[11]   *See id.* (The defendant complained that the trial court erred "in refusing his request to define the term 'deception,'" and this Court concluded that the defendant "has shown some harm.").

[12]   *See Vasquez v. State*, 389 S.W.3d 361, 366-67 (Tex. Crim. App. 2012).

[13]   *See Gelinas v. State*, 398 S.W.3d 703, 707 (Tex. Crim. App. 2013) (plurality op.) ("[W]e do not agree with the great weight the *Hutch* plurality placed on this factor, weighing in favor of finding egregious harm, simply because of the error's location in the application paragraph.  Just as Presiding Judge Onion stated in his concurring and dissenting opinion in *Almanza*, we, too, question the wisdom of reversing upon 'finding a single defect in the exalted "application paragraph" . . . without consideration of the charge as a whole, or considering whether the jury was in any way misled.'") (quoting from *Almanza*, 686 S.W.2d at 177 (Onion, P.J., concurring and dissenting)) (ellipsis in *Gelinas*); *id.* at 711 (Cochran, J., concurring) (concluding that erroneous application paragraph instructions were "100% legalese" and made "no sense.").

"general instructions" that would be followed by "some specific rules of law about this particular case."[14]  After three pages of general instructions, the jury charge then turned to Appellant's case.  Starting on page four, the very first two paragraphs of the specific instructions told the jury that Appellant was charged with "murder" and what "murder" means:

> Now, bearing in mind these instructions, the Defendant, Tareq Alkayyali, stands charged by indictment with the offense of murder, alleged to have been committed on or about the 28th day of May, 2019, in Tarrant County, Texas.  To this charge, the Defendant has pleaded not guilty.
> A person commits the offense of murder if he intentionally or knowingly causes the death of an individual; or if he intends to cause serious bodily injury and commits an act clearly dangerous to human life that causes the death of an individual.

These two paragraphs were clear and concise.  The first told the jury that Appellant was charged with murder, and the second set out two theories of murder, both of which explicitly said that a murder occurs only if the defendant "causes the death of an individual."  By immediately explaining what murder means after saying that Appellant was charged with it, the second paragraph conveyed to the jury that it was setting out the elements of murder, causation being one of them.  And because the second paragraph with the abstract definition of murder followed on the heels of the first paragraph highlighting that the defendant was charged with murder, the abstract murder definition was prominent.

> **2. *The application murder paragraph was difficult to read, so jurors had a strong incentive to focus on and defer to the abstract murder paragraph.***

After setting out abstract instructions relating to murder, the jury charge set out the

---

[14]  The paragraph said: "First, I will give you some general instructions which apply in every case.  Then I will give you some specific rules of law about this particular case, and finally I will explain to you the procedures you should follow in your deliberations."   The third category—procedures—involved  instructions on matters not at issue here, which included consulting with other jurors, selecting a presiding juror, not communicating with other people outside the jury room about the case, and delivering a unanimous verdict.

application paragraph, as follows:

> Now, if you find from the evidence beyond a reasonable doubt that the Defendant, Tareq Alkayyali, on or about the 28th day of May, 2019, in the County of Tarrant, State of Texas, did then and there intentionally or knowingly cause the death of an individual, Wasam Moussa, by impeding the normal breathing or circulation of the blood of Wasam Moussa by applying pressure to her throat or neck with his hand or arm or by blocking her nose or mouth with his hand or hands; or if you find from the evidence beyond a reasonable doubt that the Defendant, Tareq Alkayyali, on or about the 28th day of May, 2019, in the County of Tarrant, State of Texas, did then and there intentionally, with the intent to cause serious bodily injury to Wasam Moussa, commit an act clearly dangerous to human life, namely, by impeding the normal breathing or circulation of the blood of Wasam Moussa by applying pressure to her throat or neck with his hand or arm or by blocking her nose or mouth with his hand or hands, then you will find the Defendant guilty of the offense of murder.

To put it mildly, this application paragraph is difficult to read. The paragraph is actually a single sentence, and that sentence is long and unwieldy. The two theories of murder are separated by a mere semicolon. Other than the semicolon and the use of parallel, repetitive language, no organizational methods, such as spacing or numbering, are used to separate the two theories of murder liability. This is the kind of paragraph that makes one's eyes glaze over. It is the kind of paragraph that writing experts warn against drafting.

Objective metrics back up this conclusion. The version of Microsoft Word currently used by the Court incorporates an ability to analyze the Flesch-Kincade Grade Level and the Flesch Reading Ease Score of a particular passage. A passage is more readable if the Flesch-Kincade Grade Level is lower and the Flesch Reading Ease Score is higher. For example, the sentence, "The dog jumped over the moon," has a Flesch-Kincade Grade Level of 0.5 and a Flesch Reading Ease Score of 100. It is a very easy sentence to read. Analyzing the *abstract* murder paragraph in Appellant's jury charge yields a Flesch Kincade Grade Level of 12.8 and a Flesch Reading Ease Score of 41.3. Those scores signify a substantially more challenging passage. But the results for the *application*

murder paragraph are much worse: a Flesch Kincade Grade Level of 41.0 and a Flesch Reading Ease Score of 0.0.

Despite the difficulty of the reading level, it would be obvious to anyone that the application murder paragraph was intended to be an application of the principles in the abstract murder paragraph. That is, the two paragraphs were obviously intended to be abstract and application counterparts. Common sense suggests that, when faced with an easy-to-read passage and a difficult-to-read counterpart, a jury will gravitate to the easy-to-read passage. Even if the jury resolved itself to treat the passages equally, it would be a natural conclusion for such a jury to assume that an element that clearly appears in the easy-to-read passage must be somewhere in the more difficult-to-read counterpart passage.[15]

And while the semicolon in the application paragraph/sentence technically separates two wholly independent "if" clauses—only one of which includes the causation element—a semicolon denotes less separation than a period, and the semicolon here is used in an unusual way in an especially complex sentence. This challenging grammatical structure might contribute to a conclusion that the causation element appearing in the first "if" clause applies to the entire sentence.

---

[15] *See Gelinas*, 398 S.W.3d at 711 (Cochran, J., concurring) ("Let's face it. This jury (1) did not read the Article 38.23 jury instructions; (2) did read the instructions, but did not understand what they really said, and therefore ignored them; or (3) did read the instructions, knew that they were wrong, and therefore ignored them. The third option is the least likely; after all, neither the parties nor the trial judge knew that the instructions were wrong at the time that they were written or read. The most likely option is the first, which simply proves the old adage of 'garbage in, garbage out.' These instructions are 100% legalese. They make no sense. Trial judges should not be giving instructions like this. This is not a case in which the reviewing court should apply the usual presumption that the jury understood and applied the court's charge in the way it was written. Here, we know that the jury, composed of normal people, was unlikely to have understood the jury charge as it was written because not even the lawyers and trial judge, attuned though they may be to legalese, understood what the instructions said.").

**3.** ***Various parts of the jury charge required the jury to give effect to the abstract murder instruction, encouraging the jury to harmonize the instructions to require causation.***

As I have previously explained, the abstract murder paragraph conveyed to the jury that it was describing the elements of the charged offense of murder. Before that paragraph, two instructions in the jury charge made it clear that the jury could not find the defendant guilty unless it found all elements of the offense beyond a reasonable doubt:

> All persons are presumed to be innocent and no person may be convicted of an offense unless each element of the offense is proved beyond a reasonable doubt.
>
> * * *
>
> The prosecution has the burden of proving the Defendant guilty and it must do so by proving each and every element of the offense charged beyond a reasonable doubt and if it falls to do so, you must acquit the Defendant.

So, if the jury found that the abstract paragraph's causation element for the second murder theory was not proven, these element-of-the-offense instructions required the jury to acquit the defendant.

This Court has said that the application paragraph is what, "as a practical matter," authorizes a conviction in the jury charge.[16] But this Court has also recognized that the wording of an abstract instruction can cause it to "function[] as a kind of application paragraph."[17] "While it will usually follow that authorization for conviction appears in the application paragraph of a typical instruction, wording of the other abstract portion of the charge may also authorize the trier of fact to reach *or not reach* the ultimate issue in a case."[18] Here, the two elements-of-the-offense instructions say that a

---

[16] *Yzaguirre v. State*, 394 S.W.3d 526, 530 (Tex. Crim. App. 2013).

[17] *Malik v. State*, 953 S.W.2d 234, 235 (Tex. Crim. App. 1997).

[18] *Arceneaux v. State*, 803 S.W.2d 267, 271 (Tex. Crim. App. 1990), *overruled on other grounds by Malik*, *supra* (emphasis added).

person cannot be convicted if all the elements of the offense are not proven, and the second of these instructions explicitly requires the jury to acquit (i.e. to *refrain* from finding guilt) if an element is not proven. This second instruction, at least, is authorizational in nature and is readily susceptible to being read in conjunction with the abstract murder paragraph.

So, even if the jury were diligent enough to finely parse Appellant's application murder paragraph and determine that it did not contain the element of causation on the second murder theory, it would nevertheless have the abstract murder paragraph, which makes causation an element, and the instructions requiring an acquittal if an element is not proven. And such a diligent jury would not overlook the abstract murder paragraph. The abstract murder paragraph is simply too prominent and too clear to be overlooked by any jury, especially in light of what people generally know about murder, which I will discuss in a later section.

And if the jury realized that the abstract and application paragraphs for murder did not line up, then it would have had to consciously disregard the abstract paragraph to be misled by the absence of causation in the application paragraph. For a jury to consciously disregard the abstract paragraph in favor of a focus on the application paragraph, it would, at a minimum, have to believe that the application paragraph is more important than the abstract paragraph. But nothing in the jury charge flags the application murder paragraph as special. There are no headings in the jury charge. The application paragraph is not labeled as such. No language in the application paragraph says that it is more important than other portions of the charge.

In fact, the first page of the jury charge contains an instruction to the contrary:

You have no right to disregard or give special attention to any one instruction, or to question the wisdom or correctness of any rule I may state to you.

The jury would be disobeying this instruction if it disregarded the abstract paragraph or gave special attention to the application paragraph. If the jury did see a variance between the abstract and application paragraphs on the issue of causation, the obvious way to comply with the trial court's consider-the-entire-charge-equally instruction would have been to harmonize the instructions by giving effect to both paragraphs, requiring the State to carry its burden of proof under both of them to obtain a conviction.

4. ***The submitted lesser-included offenses both required causation.***

Causing death was an element of the lesser-included offenses. The abstract and application paragraphs for those offenses correctly instructed the jury on that element:

> A person commits the offense of manslaughter if the person recklessly *causes the death of an individual*.
>
> * * *
>
> Now, if you find from the evidence beyond a reasonable doubt that the Defendant, Tareq Alkayyali, on or about the 28th day of May, 2019, in the County of Tarrant, State of Texas, did then and there recklessly *cause the death of an individual*, Wasam Moussa, by impeding the normal breathing or circulation of the blood of Wasam Moussa by applying pressure to her throat or neck with his hand or arm or by blocking her nose or mouth with his hand or hands, then you will find the Defendant guilty of the offense of manslaughter.
>
> * * *
>
> A person commits the offense of criminally negligent homicide if the person *causes the death of an individual* by criminal negligence.
>
> * * *
>
> Now, if you find from the evidence beyond a reasonable doubt that the Defendant, Tareq Alkayyali, on or about the 28th day of May, 2019, in the County of Tarrant, State of Texas, did then and there with criminal negligence *cause the death of an individual*, Wasam Moussa, by impeding the normal breathing or circulation of the blood of Wasam Moussa by applying pressure to her throat or neck with his hand or arm or by blocking her nose or mouth with his hand or hands, then you will find the

Defendant guilty of the offense of criminally negligent homicide.[19]

The jury might not have even reached the lesser-included offenses during deliberations, but it would have heard the trial judge read the entire jury charge before the parties' closing arguments. The reading of the lesser-included-offense instructions would have reinforced the notion that causing death was an element of every offense at issue in the case. Any juror recalling the lesser–included offense instructions would find it very odd for the second murder theory to be the only offense in the entire jury charge that did not require a showing that Appellant caused the victim's death.

**5. *The State told the jury that the State had to prove causation.***

During voir dire, the prosecutor said that both theories of murder required causation:

> [A]nd then we have *two ways that you can cause the death*. Right? Caused the death of Wasam Moussa by impeding the normal breathing or circulation of the blood of Wasam Moussa by applying pressure to her throat or neck with his hand or arm, or by blocking her nose or mouth with his hand or hands, *or* with the intent to cause serious bodily injury to Wasam Moussa commits an act clearly dangerous to human life by applying pressure to her throat or neck with his hand or arm, or by blocking her nose or mouth with his hand or hands.

* * *

> The reason why the law has it written the second way is because sometimes people say, oh, yeah, I shot you, but I shot you in the foot, I didn't mean for you to die. Right? *But if you shoot at somebody and you hit them in the leg, you happen to hit an artery or something like that,* do we get to step back and say, well, that wasn't my intent? No. Right? You did something that was an act clearly dangerous to human life. You were going to do something that was going to cause serious bodily injury, and so it doesn't matter that that was your intent just to hurt somebody *if, in fact, they died*.[20]

So it was not a surprise to the jury for the abstract murder paragraph to say that both theories of

---

[19] Emphasis added. *See* TEX. PENAL CODE §§ 19.04(a), 19.05(a).

[20] Emphasis added.

murder required causation. And any juror looking at the application murder paragraph would likely say causation must be there because the prosecutor said it was. Even if a juror realized the causation element was missing from the application paragraph, the prosecutor's comments would reinforce the notion of using the abstract murder paragraph as a guide to determining the elements of the offense the State must prove.

**6. *Causation is a widely understood element of murder.***

Murder is one offense of which the American public has a high degree of awareness. The "murder mystery" is a well-recognized sub-genre of the mystery genre in various avenues of entertainment. Numerous novels have been written in the sub-genre, such as the classic *Murder on the Orient Express* by Agatha Christie. Television series abound, with classic examples being various iterations of the game show "Whodunnit"[21] and the mystery series "Murder She Wrote." The murder mystery can be found in movies, with a classic example being the 1976 film *Murder by Death*. The murder mystery has also been popularized in games such as the board game *Clue* and the dinner-party game *How to Host a Murder*. The word "whodunit" has made its way into the English lexicon, with Merriam-Webster's website defining the word as "a detective story or mystery story."[22]

This significant exposure to the murder-mystery sub-genre has caused the American public in general to be informed of certain basic concepts relating to murder, including causation. It is widely known that a murder involves one person causing the death of someone else. For instance,

---

[21] A British show of that name ran in 1974, and an American version ran in 2013.

[22] *Whodunit*, MERRIAM-WEBSTER.COM, https://www.merriam-webster.com/dictionary/whodunit (last visited February 26, 2025).

on the solution page for one of the characters in the *Roman Ruins* version of *How to Host a Murder*,

the first sentence reads:

> Everyone had a motive, everyone had access and indeed, a number of Flabbius' guests did make attempts on his life. The question is, whose attempt was successful?[23]

Because a jury would naturally expect causation to be an element of murder, it would naturally focus

on the abstract paragraph that clearly made it such.

**7. *If this jury had thought the murder application paragraph did not require causation, it would have seen a problem and reached out to the trial court.***

As I explained earlier, the abstract murder paragraph is simply too prominent and too clear,

and the causation element too consistent with what people generally know about murder, for any jury

to misunderstand or overlook it. If the jury thought the application murder paragraph was

inconsistent with its abstract counterpart, it could have sought guidance from the trial court. And

this particular jury showed that it was not shy about seeking guidance when it sent two guidance-

seeking notes to the trial court at the punishment stage of trial.[24] Consequently, we have every

reason to think that the jury here would not have hesitated to query the trial court if it thought the

abstract and application paragraphs were insolubly inconsistent. Either the jury was confident that

---

[23] Gail M. Peck, Doug Peterson, and Neil Shusterman, *Roman Ruins* (episode 11), HOW TO HOST A MURDER (1996).

[24] The jury sent three notes. The first asked for certain exhibits. In the second note, the jury asked, "May we have a clarification of what to do if we do not all agree it was sudden passion." The trial court responded, "In response to your note, please continue to deliberate." In its third note, the jury asked, "For the fine, does this go to the family, is it donated or does it go elsewhere? If it is donated, may we choose the organization it is donated to? (if we choose a fine amount)." The trial court responded, "In response to your note, if a fine is assessed, it is ordered paid to the State of Texas. Please continue your deliberations."). The jury answered "no" to a special issue on "sudden passion," sentenced Appellant to 23 years in prison, and assessed no fine.

the jury charge required causation under both murder theories or it decided that any variance on the issue of causation did not matter because causation was a given. Either way, the jury necessarily found that Appellant caused the victim's death.

**8.** ***Response to the concurring opinion (and to a degree, the other dissent).***

I appreciate the serious efforts spent by Judge Yeary and Judge Finley in addressing my first reason for finding the error harmless. Ultimately, though, I think their critiques fall short. In part, that is because the various parts of my dissent reinforce each other into a coherent whole that shows that the jury had to have understood that causation was an element, or else had to decide it did not matter because causation was proven in any event. The lynchpin of the argument is the clear, concise, and accurate abstract murder paragraph. Without it, I would be relying solely on my second reason for finding the error harmless. But as I have explained earlier, numerous factors reinforce what the abstract paragraph clearly says. While the interlocking nature of the various parts of my argument answers much of the criticism against it, I turn to some of the specific critiques.

In his concurrence, Judge Yeary suggests that the abstract murder paragraph lacked prominence because it appeared on a page with five other definitions. That reasoning assumes that the jurors' only exposure to the jury charge was reading it themselves. But, the jury charge was *read aloud* by the trial judge to the jury. In hearing it read aloud, the jurors would have naturally focused on the first reference to murder that they heard. And what the jurors heard first was a rather concise statement that Appellant was charged with murder, followed by a statement that he pled not guilty, further followed by the abstract paragraph defining the offense of murder. In fact, the judge had primed the jury to pay attention to these particular instructions by saying that he would first give some general instructions and then give instructions specific to the case. And when it came time to

transition to the case-specific instructions, the trial judge used language ("bearing in mind these instructions") to draw the jury's attention to this transition.[25]

The concurrence and Judge Finley's dissent express concerns about relying upon popular conceptions about an offense. One answer to this concern is that the causation element of murder is unique. It would be surprising to find anyone serving on a jury who did not already have a pre-existing understanding that a murder involves causing death. There is likely no other offense element that comes close to the ubiquitous understanding that American adults have about the causation element of murder. But I am not suggesting that this pre-existing understanding *alone* could render a jury-charge error harmless. My point is that this pre-existing understanding coincided with the causation element contained in the abstract murder instruction that the jurors heard. I am not disputing the concurrence's view that jurors do not necessarily expect their conceptions of an offense to gibe with the law. But here, this abnormally ubiquitous conception *does* gibe with the law, as given in the abstract paragraph, giving it much more potency than one would normally expect of an abstract paragraph. And that potency was further enhanced by the State explicitly telling the jurors, in line with what they already understood, that causation was indeed an element of both theories of murder.

The concurrence says that the application paragraph was at least as, or more, prominent because it had a page to itself. Obviously, the jury would have seen the application paragraph as such—one that applied the law to the specific indictment facts. But that does not change the fact that

---

[25] Even looking at the written page, the abstract murder definition has prominence because it is basically at the top, preceded only by statements about being charged with murder and pleading not guilty. So the jury would not have had to wade through the other definitions to find it. And the fact that the page contained a bunch of useful definitions made it more likely that the jurors would consult it.

the application paragraph was difficult to read. The concurrence seems to disagree, concluding that the paragraph was "perfectly navigable." Yet, the trial judge, the prosecutor, and the defense attorney all failed to navigate it. This was not a case where the trial participants had differing views on what the law required. They all knew that the second murder theory required causation. Yet, they all missed the fact that the application paragraph's rendition of the second murder theory did not require it. If three educated lawyers could not navigate the application paragraph, why should we expect more from the jury?[26]

Criticizing my reliance on the fact that causation appears in every other abstract and application paragraph in the jury charge, the concurrence essentially says, "If all the application paragraphs but one has causation, the jury might think the one outlier was meant to be that way." That reasoning might make sense if we were comparing only *application* paragraphs. But *all* the *abstract* paragraphs required causation, including the one that corresponded to the outlier application paragraph, so the natural conclusion to draw was that causation was an element of every offense in the jury charge.

The concurrence and the other dissent rely heavily on the application paragraph authorizing the conviction, but as I explained earlier, that is not the full story. An abstract paragraph can be "authorizational" if it tells the jury to do something if certain conditions are met or not met.[27] Most jury charges do not contain abstract paragraphs that effectively convey authorizational instructions

---

[26] *See supra* at n.15.

[27] *See supra* at nn.17, 18.

not already conveyed by the application paragraph.[28] But Appellant's jury charge did: it told the jury that Appellant was charged with murder, then set out an abstract paragraph correctly defining that offense, and, elsewhere, told the jury that it must acquit if the State fails to prove all the elements of the offense. The concurrence criticizes this point, saying if it were reasonable to think that a jury could combine instructions in this way, creating an application paragraph of its own, there would be no need for an application paragraph. But my point is not that an application paragraph is unimportant, but that we need to look at the jury charge that was actually given, in light of the trial that actually occurred. Elsewhere, the concurrence refers to a "requirement" that the application paragraph at least refer back to the abstract paragraph, but the concurrence overstates the matter, since a set of abstract instructions *can* be authorizational, if the right conditions are present.

The concurrence suggests that the problem here is that the abstract and application paragraphs conflicted, so the jury had to disregard one to give effect to the other. If the jurors were able to do what the lawyers in this case were unable to do and successfully parsed the complex application paragraph, then they would have concluded that it conflicts with the abstract paragraph. That does not mean that the jurors were relegated to throwing up their hands and deciding to pick an instruction to ignore. The solution to a perceived conflict is to seek guidance from the trial court. As I explained earlier, *this jury* showed that it was not shy about doing that—it sought help in the punishment stage *twice*. It would have sought help at the guilt stage if it had seen a conflict in the

---

[28] *See, e.g.*, *Crenshaw v. State*, 378 S.W.3d 460, 463-64, 467 (Tex. Crim. App. 2012) (".08" definition of intoxication not set out in the information was contained in an abstract instruction but not in the application paragraph, so there was nothing requiring the jury to implement it to find the defendant guilty or not guilty).

instructions that mattered. It didn't.[29]

The concurrence suggests that perhaps the jurors did not see a problem because they viewed the allegations in the application paragraph as a form of "transferred causation." Apparently the concurrence is contending that the jurors might think that certain elements in the jury charge—proof of intent to cause serious bodily injury and proof of an act clearly dangerous to human life—could be seen as "standing in" for causation. Of course, nothing in the jury charge suggests this, and there is the problem that the application paragraph does not complete this supposed constructive-causation chain by saying that the victim died.[30] And a notion of transferred or constructive causation is a complex concept that would not come naturally to jurors. It is unlikely that a jury as proactive as this one was shown to be would quietly assume that some unarticulated, complex theory of transferred or constructive causation applied to a murder theory that appeared to be missing the causation element. If the proactive jurors in this case had thought that such a theory might apply, and thought that it mattered, they would have reached out to the trial court to be sure. They didn't.

Judge Finley's dissent suggests that the jury could have reasonably assumed that the abstract murder paragraph was wrong because the application paragraph and the indictment shared the same error. But if the jurors failed to navigate the application paragraph, any judgment by them that it was similar to the indictment would not matter. At least the indictment clearly divided the two theories, but it is almost certain that the jurors did not snap to the absence of a causation element when the

---

[29] To the extent the concurrence expresses concerns about jury unanimity, I also point out that one of the issues the jury sought guidance from the trial court on was a unanimity issue.

[30] *Cf.* TEX. PENAL CODE § 6.04(b)(2) ("A person is nevertheless criminally responsible for causing a result if the only difference between what actually occurred and what he desired, contemplated, or risked is that . . . (2) a different person or property was injured, harmed, or otherwise affected.") (transferred-intent statute).

indictment was read because (1) they had no time to think about the indictment language before hearing opening statements, (2) they had previously been told that causation applied, and (3) the causation-like element of "clearly dangerous to human life" was present. And at the end of trial, the application paragraph smashed the two murder theories together, making it exceedingly unlikely that the jury would recall the precise organization of the indictment when it was read. Notably, the jury charge did not contain the indictment allegations in an accusation section, as some jury charges do.[31] But, if the jurors noticed that the indictment and the application paragraph both lacked the causation element for the second murder theory, the presence of causation in the abstract instruction would still have been a red flag that would have prompted this proactive jury to reach out to the trial court.

Most likely the jurors did not notice that the application paragraph was missing an element.[32] If the jurors did notice, they likely thought it did not matter because, as Judge Finley's dissent elaborates, it was not seriously contested that Appellant had caused the victim's death. It is possible that the jurors saw what I see, as I argue *infra* in my second reason—that a finding of causation is inevitable if they believe all the elements contained in the second part of the application paragraph in light of the evidence in the case. Regardless, the whole of this record leads to an unmistakable conclusion: the jurors either believed causation was required and found it, or believed causation was likely required and did not bother the trial court because they were finding causation anyway.

> **C. Reason 2: Given the statutory and non-statutory elements in the application murder paragraph and the evidence at trial, the jury must have found causation anyway.**

---

[31] *See Hernandez v. State*, 556 S.W.3d 308, 330 (Tex. Crim. App. 2018) (accusation section in the jury charge).

[32] *See supra* at n.15.

To set the stage for why the jury would have necessarily found causation on the basis of what was actually in the application murder paragraph, I detail just the portion of the paragraph relating to the second murder theory and emphasize some important parts:

> if you find from the evidence beyond a reasonable doubt that the Defendant, Tareq Alkayyall, on or about the 28th day of May, 2019, in the County of Tarrant, State of Texas, did then and there *intentionally, with the intent to cause serious bodily injury* to Wasam Moussa, *commit an act clearly dangerous to human life*, namely, *by impeding the normal breathing or circulation of the blood* of Wasam Moussa *by applying pressure to her throat or neck* with his hand or arm *or by blocking her nose or mouth* with his hand or hands, then you will find the Defendant guilty of the offense of murder.[33]

This portion of the application paragraph requires proof of four elements, two of which are statutory and two of which are non-statutory. The statutory elements are: (1) intent to cause serious bodily injury, and (2) committing an act clearly dangerous to human life.[34] The non-statutory elements are: (3) a culpable mental state of "intentionally" regarding the commission of the dangerous act, and (4) impeding breathing or circulation by either applying pressure to the throat or neck or by blocking the nose or mouth. As I will explain later, a finding on element (1) creates a substantial likelihood of the jury also finding causation, while a finding on elements (2) and (4), when combined with the evidence at trial, will *necessarily* entail the jury finding that Appellant caused the victim's death.

> **1. *A jury that finds "intent to cause serious bodily injury" under the jury charge and the evidence would necessarily find that Appellant intended the kind of injury that would create a substantial risk of death, and a finding of that latter intent would create a substantial likelihood of the jury also finding causation.***

In conformity with statute, the jury charge defined the culpable mental state of "intent" or intentionally" in the following way:

---

[33] Emphasis added.

[34] *See* TEX. PENAL CODE § 19.02(b)(2).

> A person acts intentionally, or with intent, with respect to a result of his conduct when it is his conscious objective or desire to cause the result.[35]

So the jury charge required the jury to find that Appellant had the conscious objective or desire to cause an injury and it required that this desired injury would be classified as serious bodily injury.

Also, in conformity with statute, the jury charge defined "bodily injury" and "serious bodily injury." Bodily injury was defined as "physical pain, illness, or any impairment of physical condition."[36] The only part of this definition that fits "serious bodily injury" under the facts of this case is "any impairment of physical condition," so I will incorporate that part into the jury charge's definition of serious bodily injury:

> bodily injury [impairment of a physical condition] that creates a substantial risk of death or that causes death, serious permanent disfigurement, or protracted loss or impairment of the function of any bodily member or organ.[37]

The parts of the "serious bodily injury" definition that involve "serious permanent disfigurement" or "protracted loss or impairment of the function of any bodily member or organ" do not really apply here. Appellant was not charged with poking someone's eye or cutting off a finger. What he was charged with—impeding breathing or circulation—threatened perhaps four "organs": the brain, the lungs, the heart, and the entire circulatory system. Any "protracted impairment" of one of these "organs" is inherently tied to the risk of death. So the application paragraph effectively required the jury to find that Appellant had the conscious objective or desire to create an

---

[35] *See* TEX. PENAL CODE § 6.03(a).

[36] *See id.* § 1.07(a)(8).

[37] *See id.* § 1.07(a)(46). Bracketed material added based on jury charge's definition of "bodily injury."

"impairment of physical condition that creates a substantial risk of death."[38]

Finding this culpable mental state does not alone make a finding of causation inevitable, but it does make such a finding very likely. If a jury believes that a defendant intended to engage in conduct that creates a substantial risk of death, the jury is much more likely to also believe that the victim's death was in fact the result of that intended conduct.[39]

> **2.** ***A jury that finds that Appellant committed "an act clearly dangerous to human life" would necessarily find that he committed an act that created a substantial risk of death.***

I turn to the second statutory element contained in the application paragraph: that the defendant "commit[ted] an act clearly dangerous to human life."[40] The word "dangerous" is not statutorily defined, but it means "able or likely to cause harm or injury."[41] Thus, the word "dangerous" itself is suggestive of causation, and when used in conjunction with human life, indicates a risk of causing death. In addition, the word "clearly" modified "dangerous," so we are not talking about an insubstantial or remote risk. So, to find Appellant guilty under the application paragraph, the jurors had to believe, not only that Appellant intended to subject his wife to a physical condition that created a substantial risk of death, but that he also committed an act that created such a substantial risk of death.

---

[38] I will not address the language "or causes death" in the definition since it is alternative wording and involves proving more than "a substantial risk of death."

[39] As set out earlier, the jury charge varies from statute by placing the word "intentionally" before the phrases "intent to cause serious bodily injury" and "clearly dangerous" act. I need not address whether "intentionally" here adds meaning not otherwise conferred by the culpable mental state of "intent to cause serious bodily injury."

[40] *See supra* at nn.33, 34, and accompanying text.

[41] *Dangerous*, COREL WORDPERFECT 2021 DICTIONARY.

**3.** ***A jury that finds that Appellant created a substantial risk of death by "impeding the normal breathing or circulation of the blood," as required by the application paragraph, would necessarily find that Appellant caused death under the evidence in this case.***

An abstract instruction in the jury charge set out the statutory standard of causation:

A person is criminally responsible if the result would not have occurred but for his conduct, operating either alone or concurrently with another cause, unless the concurrent cause was clearly sufficient to produce the result and the conduct of the actor was clearly insufficient to produce the result.[42]

This standard requires that the defendant's conduct be a "but for" cause if the defendant's conduct operates alone. If another cause is present, and the two together operate as a "but for" cause of the result, then the defendant's conduct counts as a "cause" *unless* the defendant's conduct is "*clearly* insufficient" to produce the result *and* the other concurrent cause is "*clearly* sufficient" to produce the result.

The word "clearly" appears both in the statutory standard for causation and in the "act clearly dangerous to human life" element of the second murder theory. The appearance of the word in both contexts suggests the following question: When can an act that is clearly dangerous to human life be clearly insufficient to cause death? There are only a few possible answers to that question, and it will become clear in my discussion that none are implicated in this case. As we shall see, a jury's finding of guilt under the wording of the second part of the application paragraph, by itself, almost guarantees a finding of causation under the statutory definition. When the evidence at trial is factored in, the application-paragraph wording finishes the job. In a nutshell, the application-paragraph allegation of "impeding the normal breathing or circulation of the blood," when combined with the "clearly dangerous act" allegation and undisputed evidence, establishes causation unless

---

[42] *See* TEX. PENAL CODE § 6.04(a).

something breaks causation as a concurrent cause. And the only way a concurrent cause could break causation under these allegations would be if it were *clear* that the dangerous effects of the "impeding" conduct were undone *and* that some other cause was clearly sufficient to explain the victim's death. Neither of those causation-breaking blocks is supported by the evidence at trial.

No one disputes that the victim died. Nor does anyone dispute that, whatever conduct it was that Appellant engaged in, the victim collapsed into unconsciousness during the conduct and died from that collapse. Nor is it disputed that the victim's death happened because she stopped breathing or her blood stopped circulating. At most, the dispute centers around what created that condition—the defendant's conduct, the victim's health problems, or a combination of both.

To find Appellant guilty under the language of the second part of the application paragraph, the jury had to believe that Appellant engaged in either strangulation—impeding the normal breathing or circulation of the blood by applying pressure to the victim's throat or neck—or suffocation—impeding the normal breathing or circulation of the blood by blocking the victim's nose or mouth. The "impeding" part of strangulation or suffocation is a "bodily injury" because it is an "impairment of physical condition."[43] And because "impeding" is part of the conduct alleged, it is part of the *act*, but it is also the *injury* at issue in this case.

As I explained earlier, an "act clearly dangerous to human life" is one that creates a substantial risk of death. So, under Appellant's jury charge, the question boils down to whether Appellant created an "impeding" severe enough to create a substantial risk of death. "Creating a

---

[43] *See also Ortiz v. State*, 623 S.W.3d 804, 807 (Tex. Crim. App. 2021) ("Impeding normal breathing or blood circulation describes occlusion assault's required injury."). For the remainder of this opinion, I use "impeding" as shorthand for "impeding the normal breathing or circulation of the blood."

risk" is causation-type language. Something creates a "risk" of death because it has some tendency to cause death. And something creates a substantial risk of death if it has a substantial tendency to cause death. And because "impeding" is an *injury* and not just part of an *act*, an "impeding" that creates a substantial risk of death also constitutes an injury that has a substantial tendency to cause death.

When the conduct that creates a substantial risk of death is not itself an injury, the causal tendency that the risk involves might not be realized. For example, if a defendant shoots at someone, the very act of shooting creates a substantial risk of death. Just shooting at someone has a tendency to make that person's death happen. If the bullet misses, then that risk, that causal tendency, is not realized. If a hypothetical defendant shoots at a victim and misses, and a car swerves onto the sidewalk for a completely unrelated reason and kills the victim, one could say that the defendant did not in fact cause the victim's death, despite creating a substantial risk of death and despite the fact that the victim died. The gunshot would not be a "but for" cause of death in that situation.

But the risk of death from "impeding" flows from the defendant's hands-on impairment of the victim's physical condition (the impeding "injury"). It is the severity of the impairment or injury (e.g., how severe breathing is being restricted), not the risk of impairment or injury (e.g., whether a gunshot will hit), that poses the risk of death under the application paragraph's instructions. So it becomes more difficult to see how an *injury* that creates a substantial risk of death would be causally unrelated to a death that shortly follows the injury and is consistent with the injury. If there are no concurrent causes, then a rational jury would have to find in that situation that the injury was a "but for" cause of the death that it had created the substantial risk of causing.

On the other hand, if there were *two* life-threatening injuries, and these two injuries were threatening in *different ways*, one might be found to be a "but for" cause of death while the other is not. If shooting a victim in the arm creates a substantial risk of death if the victim bleeds out, but a large boulder independently falls on and crushes the victim before any bleeding out occurs, then we could say that the gunshot injury to the arm did not in fact cause death. In the bleeding-arm scenario, the gunshot was not a "but for" cause of death because death was caused instead by the boulder.

But what if the two life-threatening injuries were threatening in basically the same way? Suppose the victim were shot (by two different people) in two different places—e.g., an arm and a leg—and each injury created a substantial risk of death from bleeding out? If neither wound is bandaged and the victim dies from bleeding out, both wounds would be concurrent causes—concurrently acting as a "but for" cause—and neither would be clearly insufficient to cause death. In that situation, both shooters would be said to have caused the victim's death under Texas law. If the leg was bandaged, so that the risk of bleeding out was stopped, it might be possible to say that the leg wound was clearly insufficient to cause death due to ameliorative action. Of course, if the bleeding leg healed quickly on its own, despite the substantial risk of death it posed, then it might also be said that the bleeding leg was clearly insufficient to cause death.

But in Appellant's case, even if the evidence showed two life-threatening injuries that could explain why the victim stopped breathing or her blood stopped circulating—Appellant's "impeding" conduct and the victim's pre-existing medical condition—that would not make Appellant's "impeding" conduct "clearly insufficient" to cause the result. After all, the jury would have found that the "impeding" injury that Appellant inflicted created a substantial risk of death. How can an

injury be "clearly insufficient" to cause death while also creating a substantial risk of death? As explained above, the only way a substantial risk of death from an injury could become clearly insufficient would be if that substantial risk of death were clearly ended somehow. No such evidence exists in the record. Although the victim received CPR, no evidence suggests that such activity clearly eliminated the substantial risk of death Appellant's "impeding" injury created. And the victim never recovered after collapsing.

Moreover, the record does not show that the victim's medical condition was a life-threatening injury. The expert testimony was that the victim's heart repair was "intact." The testimony from Appellant suggests that the victim was suffering from fainting and other symptoms that might have been a sign of a health problem, but none of that *clearly* showed a health problem that was "sufficient" by itself to cause death, and certainly not on the day of the incident. In fact, the victim had lived for 18 years before even having a heart repair. And to the extent the victim's medical condition made her vulnerable to *stress*, clearly-dangerous-to-human-life "impeding" conduct against her would be extremely *stressful*.

The plurality opinion points to evidence that it thinks casts doubt on whether Appellant's "impeding" conduct caused death. I do not agree that the evidence the plurality points to has the persuasive value the plurality thinks it does. The petechiae under the scalp strongly supports a finding of strangling or suffocation, and the absence of petechiae in the eyes or elsewhere does not undermine such a finding. But even if it did, and even if the other questions the plurality raises about the medical evidence and the victim's health were valid, none of it would matter. Once the jury concludes, in accordance with the application paragraph, that Appellant inflicted an injury that created a substantial risk of death, all of this other evidence just muddies the concurrent-causation

waters. None of it shows that the defendant's conduct was clearly insufficient to cause the victim's death or that the victim's health condition was clearly sufficient to do so.

Appellant introduced his own testimony that his conduct was not that bad and that he could not have foreseen what would happen to his wife. That testimony, if believed, would negate the culpable mental state and the "clearly dangerous act" elements in the application paragraph. And all of Appellant's testimony about the victim's health problems could be used to feed those defensive positions—to explain why the victim died when the defendant's conduct was not clearly dangerous or was not intended to be serious enough to create a substantial risk of death. And if the plurality is right about the medical evidence, the lack of certainty in that evidence could also be used to suggest to the jury that the State had not proven that Appellant engaged in clearly dangerous conduct. But once the jury in this case took the step of finding that Appellant committed an act clearly dangerous to human life, a finding of causation became inevitable.

And it should be emphasized that the legislature put its thumb on the scale when it used the word "clearly" twice in the concurrent causation statute—biasing the inquiry into concurrent causation in favor of finding causation. Muddying the waters on the sufficiency or insufficiency of a concurrent cause is not enough to negate that bias in favor of causation. And here, we are not reviewing from scratch what a jury might think about causation. The issue being analyzed here is what the jury would have thought about an omitted element if it found the elements that were *present* in the application paragraph. So it must be assumed that the jury found the elements that were present, and under that assumption, the jury necessarily would have found the absent element of causation.

**4. *Response to concurring opinion.***

The concurrence first contends, albeit in a footnote, that "impeding" breath or blood circulation is not necessarily an "injury." The concurrence bases this contention on his own dissenting opinions disagreeing with the majority of the Court.[44] Those dissents are contrary to the law. Even if credence were given to this contrarian view, at least one of those dissents has acknowledged that an "impeding" could be "protracted or forceful enough" to cause an injury.[45] Certainly, an "impeding" via suffocation or strangulation that was *clearly dangerous to human life* would necessarily be of such severity. In any event, by requiring a clearly-dangerous-to-human-life "impeding," the jury charge necessarily required the jury to find that Appellant put the victim's life in significant danger through direct physical action that would impede her breathing or circulation. Such physical action necessarily had a strong tendency to cause death.

The concurrence also contends that, even if the victim's death was not disputed, the application paragraph did not require the jury to pass on it. That does not matter. The victim's death was the backdrop of the State's case. There was expert testimony about her autopsy. The jury necessarily believed she died. And that belief forges the link in the chain between the application-paragraph allegations and causation.

The concurrence asserts that, without an explicit instruction that the jury must find that

---

[44] *See Marshall*, 479 S.W.3d at 846 (Yeary, J., concurring and dissenting, but dissenting on the issue in question) ("The Court concludes that a finding that Appellant impeded Shawne's breathing amounts to a finding of 'bodily injury per se[,]' and on that basis it holds that Appellant suffered no egregious harm by the jury charge error for *Almanza* purposes. I agree only that the application paragraph was erroneous. I cannot accept the Court's conclusion that 'impeding normal breathing . . . by blocking the . . . nose or mouth' constitutes 'bodily injury' per se.") (citations omitted, ellipses in Judge Yeary's op.); *Ortiz v. State*, 623 S.W.3d 804, 813 n.2 (Tex. Crim. App. 2021) (Yeary, J., dissenting) (adhering to his view in *Marshall*).

[45] *Marshall*, *supra* at 848 (Yeary, J., concurring and dissenting).

Appellant "caused the death," we cannot infer that the jury passed on whether Appellant caused the victim's death. But of course we can. Let's start with the following logic that would apply to a scenario lacking a concurrent cause:

> 1. The defendant exerted force against the victim in a close physical contact situation ("impeding" language in the application paragraph).

> 2. The force exerted in premise 1 had a high probability of causing the victim's death ("act clearly dangerous to human life" language in the application paragraph).

> 3. The victim died (incontrovertible fact shown by the evidence).

> 4. The collapse that led to the victim's death occurred during the exertion of force in premise 1 (undisputed fact shown by the evidence).

> 5. No fact independent of the defendant's conduct explains, or contributes to explaining, the victim's death (true if no concurrent cause is shown—assumed for purposes of further analysis).

> Conclusion: The defendant caused the victim's death.

No rational juror would deny the conclusion after accepting premises 1 through 5.

> But, the plurality essentially says, there was a concurrent cause: the victim's health problems.

To account for concurrent causation, we can modify premise 5 to say:

> 5. No fact independent of the defendant's conduct adequately explains, under the law of concurrent causation, the victim's death.

Even with premise 5 so modified, the conclusion still follows. The question is whether a rational juror could deny premise 5 under the evidence if he accepts premises 1 through 4, and the answer is "no." As I have explained earlier, for independent conduct to "adequately" explain the victim's death under the law of concurrent causation (so as to relieve the defendant of liability), the evidence must show that the defendant's conduct was "clearly insufficient" to cause death *and* that the independent conduct was "clearly sufficient" to cause death. If the jury finds the facts required by

the second murder theory's application instructions, neither of these is shown. The victim's death occurred because she stopped breathing or her blood stopped circulating. The medical evidence does not even come close to ruling out Appellant's "impeding" conduct as a cause of that. No rational jury who believes that Appellant's "impeding" conduct was *clearly dangerous to human life* would believe that the "impeding" was "clearly insufficient" to cause such a death. It is also true that there is no evidence that any health problem the victim had was clearly sufficient to cause death. So, a rational juror who believes the second murder theory's application instructions would necessarily believe that causation was shown.

The concurrence may be saying that, even if the jury must have found causation, we cannot be sure that the jury was *aware* it found causation, and that such lack of awareness violates due process. Given the fact that the jury charge is littered with references to causation, including the first murder theory, it is overwhelmingly likely that the jury was in fact aware it was finding causation (and there are the arguments I made under my first reason). But if by some chance the jury was not so aware, it found causation nevertheless. Especially absent an objection, I see no due process problem with the jury's lack of awareness that it was formally finding causation, so long as we can conclude, as I have, that the jury necessarily believed that Appellant caused the death.

Finally, the concurrence relies upon a dissent by Judge Clinton.[46] But it is not the law; it is a dissent.[47] And in fact, the concurrence cites this dissent for *why* it is a dissent, which means the

---

[46] *See Lawrence v. State*, 700 S.W.2d 208, 218 (Tex. Crim. App. 1985) (Clinton, J., concurring).

[47] *See Masterson v. State*, 155 S.W.3d 167, 175 (Tex. Crim. App. 2005) ("[B]ut the dissent is just that - a dissent.").

pronouncement being cited is contrary to established law.[48] And in any event, *Lawrence* appears to be distinguishable on both my harm-analysis reasons. Nothing in the application paragraph in *Lawrence* led, by any chain of reasoning, to a conclusion that the jury must have found the omitted element of the absence of sudden passion.[49] And I haven't been able to locate an abstract paragraph in any of the *Lawrence* opinions, but given the nature of the absence of sudden passion as an *implied* statutory element, the element was likely also absent from the abstract murder instructions.[50]

### D. Additional consideration: The jury's reaction to the sudden passion issue at the punishment stage.

The punishment stage cannot influence the guilt stage, but a jury's conduct during the punishment stage can sometimes give a court a window into what the jury was thinking at the guilt stage. As can be seen from the punishment-charge instructions, the "sudden passion" issue presupposed that the jury had found that Appellant had caused the victim's death:

> Now, having found the defendant guilty of the offense of murder, you must determine by a preponderance of the evidence whether or not the defendant *caused the death* under the immediate influence of sudden passion arising from an adequate cause.
>
> \* \* \*
>
> Now, bearing in mind the foregoing instructions, if you unanimously believe the defendant proved by a preponderance of the evidence that the defendant, having committed the offense of murder, *caused the death* of Wasam Moussa, under the immediate influence of sudden passion arising from an adequate cause, you must make an affirmative finding as to the special issue, and the punishment you must

---

[48] *See Lawrence*, 700 S.W.2d at 218 (concluding that "voluntary manslaughter is an incidental theory of the defense," so "the subtle deletion of the State's burden of proof on the absence of sudden passion in the murder application paragraph cannot realistically be construed to inure to the defendant's egregious harm.").

[49] *See Lawrence v. State*, 699 S.W.2d 229, 229-30 (Tex. App.—Austin 1983), *rev'd,* 700 S.W.2d 208 (setting out application paragraph).

[50] *See supra* at n.5.

assess is by confinement in the Texas Department of Criminal Justice for any term of not more than twenty years or less than two years.

* * *

But, if you do not unanimously believe the defendant proved by a preponderance of the evidence that the defendant, having committed the offense of murder, *caused the death* of Wasam Moussa, under the immediate influence of sudden passion arising from an adequate cause, you must make a negative finding as to the special issue, and the punishment you must assess is by confinement in the Texas Department of Criminal Justice for life or for any term of not more than ninety-nine years or less than five years.

* * *

Do you the Jury find by a preponderance of the evidence that the defendant *caused the death* of Wasam Moussa, under the immediate influence of sudden passion arising from an adequate cause?[51]

As I alluded to earlier, the jurors sent a note to the trial court about the sudden-passion issue; they wanted to know what to do "if we do not all agree it was sudden passion."[52]  The jurors said nothing about causation, despite the fact that the sudden-passion issue was littered with references to it.  If the jurors had not in fact found causation at the guilt stage of trial, the natural reaction to the sudden-passion issue would have been to send a note along the lines of, "We didn't find that the defendant caused the victim's death.  Were we supposed to?  What do we do now?"  Or at least, one would think the jurors would ask, "Do we need to find that the defendant caused the victim's death to answer the 'sudden passion' issue 'yes'?"  But the jurors' only question about the sudden-passion issue was what to do if they could not resolve the issue unanimously.[53]

---

[51]  Emphasis added.

[52]  *See supra* at n.24.

[53]  If the jurors had not yet looked at the verdict forms, they could legitimately have had a question about whether a *negative* answer to the sudden passion issue had to be unanimous, since

And while the sudden-passion issue presupposed a finding of causation, there is no reason to think that the jurors' rejection of the issue was based on a failure to find causation. From the verdict forms, the jurors knew that an affirmative finding to the sudden passion issue would place a 20-year ceiling on the punishment.[54] The jurors exceeded that ceiling, but not by a lot: they assessed a punishment of 23 years. If a failure to find causation was the only reason for a negative answer to the sudden-passion issue, the jurors could have assessed a sentence of 20 years or less in the blank for the verdict form that rejected a finding of sudden passion. They knew from that verdict form that a minimum sentence of 5 years was possible.[55] Assessing a sentence greater than 20 years merely on a technicality that makes the defendant even *less* culpable—that technically the sudden-passion issue requires a causation that the jurors didn't find—would be irrational, especially with the jurors already considering a 20-ish sentence. By assessing a sentence above 20 years, the jurors clearly signaled that they were finding the defendant to be *more* culpable than the sudden-passion issue described—though perhaps not by a lot.

Though a lot of other factors can figure into a relatively low sentence, such as the lack of a

---

instructions told the jurors to decide whether they "unanimously believe" the defendant proved sudden passion or "do not unanimously believe" the defendant proved it. But the verdict forms cleared that up. The first verdict form required, before filling in the blank for a sentence from 5 to 99 years or life, that the jurors had "unanimously made a negative finding" to the sudden passion special issue. Conversely, the second verdict form required, before filling in a blank for a sentence from 2 to 20 years, that the jurors had "unanimously made an affirmative finding" on that issue. When the trial judge told the jurors to "keep deliberating," any residual confusion would have been cleared up: the jurors would know that they had to be unanimous one way or the other. And if the jurors understood that already from the verdict forms, and were just wondering whether there was a third option if they did not agree, the trial court's answer conveyed that they were expected to come to an agreement.

[54] *See supra* at n.53.

[55] *See id.*

prior criminal history, the jurors' sentence of 23 years might suggest that they in fact relied upon the second murder theory at guilt—that they viewed Appellant as not being an intentional murderer and perhaps also accepted his statements of remorse. Nevertheless, the jurors' response to the sudden-passion issue in their note suggests that they were not at all surprised by the causation references, because they had in fact already found causation.

**E**. **Response to concurrence: We should not be quick to find structural error.**

**1.** *The Court should not use the Texas Constitution to start recognizing its own categories of "structural" error.*

The concurrence contends that this Court should recognize a category of "structural errors" under the Texas Constitution that are immune from a harm analysis. The concurrence further contends that a jury-charge error that entirely omits an element of the offense would be one such error.[56] I cannot agree with the concurrence's proposed change in our jurisprudence.

In *Cain v. State*, this Court purposefully set out a broad rule that *all* errors, except for those labeled as "structural" by the United States Supreme Court, would be subject to a harm analysis:

> Except for certain federal constitutional errors labeled by the United States Supreme Court as "structural," no error, whether it relates to jurisdiction, voluntariness of a plea, or any other mandatory requirement, is categorically immune to a harmless error analysis.
>
> * * *
>
> [A]ppellate courts should not automatically foreclose the application of the harmless error test to certain categories of error. Where an error is shown to be harmless, it is not a ground for reversal, regardless of the category or label attached to that particular error.[57]

---

[56] The concurrence acknowledges that this case does not involve such an error.

[57] 947 S.W.2d 262, 264 (Tex. Crim. App. 1997).

This Court expressly overruled every other case that conflicted with that pronouncement.[58]

In fact, later cases have recognized that "*Cain* issued a 'broad mandate' that brought the overwhelming majority of errors within the purview of a harm analysis."[59] *Cain* signaled that the era of widespread-automatic-reversible-error had ended.[60] This Court has reaffirmed *Cain*'s holding numerous times, including very recent cases.[61] Even our sister court, the Texas Supreme Court, has

---

[58] *Id.* ("To the extent that *Marin*, *Morales*, *Whitten*, and any other decision conflicts with the present opinion, they are overruled."). In another case, the concurrence has argued that we should not continue to adhere to *Cain* because, unlike the harm standard in place when *Cain* was decided, the current constitutional harm standard in our rules of appellate procedure allows for certain errors not to be subject to a harm analysis. *See Lake v. State*, 532 S.W.3d 408, 418-19 (Tex. Crim. App. 2017) (Yeary, J., concurring). I think it is highly unlikely that the Court intended to overrule the purposefully broad pronouncement in *Cain* in a rule adopted *just a few months later* that had the ostensible purpose of making a showing of harm more difficult by imposing a more harmless-friendly non-constitutional standard. *See* TEX. R. APP. P. 44.2(a) (West 1998) (effective September 1, 1997). Rather, it appears that the change in the wording of the constitutional standard was merely a recognition, as in *Cain*, of the reality of some structural errors and not an effort to abrogate or change the holding in *Cain*. This Court's continued adherence to *Cain* long after the rule change strongly reinforces my conclusion. *See infra.*

[59] *Gray v. State*, 159 S.W.3d 95, 96 (Tex. Crim. App. 2005) (quoting *Gonzales v. State*, 994 S.W.2d 170, 171-72 (Tex. Crim. App. 1999)).

[60] *See Hawkins v. State*, 135 S.W.3d 72, 82 (Tex. Crim. App. 2004) ("[T]he idea that violation of a 'mandatory statute' constitutes automatic reversible error contradicts our developing harmless error jurisprudence.") (citing *Cain* and *Almanza*); *Taylor v. State*, 109 S.W.3d 443, 450 (Tex. Crim. App. 2003) ("To the extent that prior cases (including *Morrow* and *Lane*) suggested that harm is automatic, they were overruled by *Cain v. State*, where we held that all errors are subject to a harm analysis except those labeled by the United States Supreme Court as structural."); *Ford v. State*, 73 S.W.3d 923, 925 (Tex. Crim. App. 2002) ("violation of a mandatory statute" rationale "would re-establish automatic reversible error, contrary to the language and purpose of Rule 44.2 and contrary to our opinion in *Cain*").

[61] *Becerra v. State*, 685 S.W.3d 120, 141 (Tex. Crim. App. 2024); *King v. State*, 666 S.W.3d 581, 587 (Tex. Crim. App. 2023); *Stredic v. State*, 663 S.W.3d 646, 655 n.30 (Tex. Crim. App. 2022); *cf. Rios v. State*, 665 S.W.3d 467, 485-86 (Tex. Crim. App. 2022) (finding the failure to accord a jury trial to be structural error based on the holding in *Sullivan v. Louisiana*, 508 U.S. 275 (1993), that a deficient "reasonable doubt" instruction was structural by denying the right to a jury trial).

been influenced by that decision, calling it "thoughtful."[62]

Moreover, the holding in *Cain* dovetailed with concerns expressed in *Almanza*, the fountainhead case for determining when jury-charge errors are reversible. "[I]n *Almanza v. State*, we decried a trend 'to label certain errors "fundamental" then automatically reverse convictions without regard to the nature and harm of the error in the case.'"[63]

If we backtracked on *Cain* now, and afforded the possibility that a large number of state constitutional errors could be structural, we would threaten to seriously undermine the salutary effects of *Cain*'s holding. The United States Supreme Court has recognized only a few structural errors,[64] but in the past this Court has not been so restrained. At the time it was handed down, *Almanza* itself recognized the labeling of errors as "fundamental" and automatically reversible as "[t]he modern trend" and a "movement [that] became almost suddenly firmly entrenched as a policy of the Court."[65] Without the limitation on "structural" errors imposed by *Cain*, this Court and the courts of appeals would be subject to significant temptations to hold various errors immune from a harm analysis even when the errors are clearly harmless.

Part of the point of both *Cain* and *Almanza* is that this Court should not ignore the reality of a particular error being obviously harmless. As this Court said in *Almanza*, "As a court of last resort we should not be so far removed from reality that we cannot see when common sense coincides with

---

[62] *In re D. I. B.*, 988 S.W.2d 753, 758-59 (Tex. 1999).

[63] *Hawkins*, 135 S.W.3d at 82 (quoting *Almanza*, 686 S.W.2d at 172-73).

[64] *Greer v. United States*, 593 U.S. 503, 513 (2021) ("Only in a 'very limited class of cases' has the Court concluded that an error is structural, and 'thus subject to automatic reversal' on appeal.").

[65] *Almanza*, 686 S.W.2d at 172-73.

the fair administration of justice."[66]   And there is really no significant downside to imposing a harm analysis.  At least when an error is constitutional and preserved, the "beyond a reasonable doubt" standard for finding harm is lenient, and any difficulty in determining harm amounts to a finding that the error was harmful.[67]   And if a more onerous harm analysis applies because error was not preserved, that is because the failure to preserve itself affects a determination of whether the defendant's rights have been prejudicially infringed upon.  That seems, after all, to be the whole point of *Almanza* imposing separate harm standards for preserved and unpreserved jury-charge error.  It is also the point of the federal system imposing different standards for reversing on preserved error and "plain" error.  Ultimately, the fairest and most accurate way to approach harm is to just do the harm analysis and see where it leads.

> **2. *A failure to object might forfeit the "structural" aspect of an error, or at least change how it is analyzed.***

Even if the Texas Constitution did include a category of "structural" errors, a failure to object to such an error could forfeit the structural aspect of the error, or at least change it so as to prevent an automatic finding of harm.  In *Jimenez*, this Court recognized that a federal harm analysis for a particular jury-charge error could be forfeited by a failure to object:

> But the "beyond-a-reasonable-doubt" standard for constitutional errors does not apply
> in this case because the error was not objected to.

* * *

---

[66]   *Id.* at 173.

[67]   *See Cain*, 947 S.W.2d at 264 ("Of course, where the error involved defies analysis by harmless error standards or the data is insufficient to conduct a meaningful harmless error analysis, then the error will not be proven harmless beyond a reasonable doubt."); *see also D. I. B.*, 988 S.W.2d at 758-59 (quoting this passage in *Cain* for the proposition that "in many cases, the threshold for demonstrating harm is *minimal*") (emphasis added).

> [I]n order to invoke the protection of this federal rule in a state court, the appellant must have complied with the state court's procedural rule for preserving and presenting error.[68]

And even when the lack of preservation does not forfeit review altogether, how harm is evaluated could change:

> Most jurisdictions consider unpreserved error under rules for "plain error." The standards for plain error are different from those for preserved error. The standards for harm may be higher, and the burden of showing harm different. Even when the higher standards are met, the appellate court may have discretion whether to consider the error at all, extending review only to very serious errors.[69]

*Almanza* provides a straightforward example of this phenomenon, with its two-tiered harm framework, but the analysis could also apply to the "structural" nature of a particular error. For example, the United States Supreme Court has left as an open question whether the structural nature of an error would automatically satisfy *one* of the four prongs of a federal plain error analysis for unpreserved errors.[70] Answering that open question for Michigan, the Supreme Court of Michigan said it did, but that court still left room for the State to rebut a presumption of unfairness.[71] Even if the "structural" nature of an error suggested that conducting a harm analysis would not be worth the effort, that calculus might change if error were not preserved.

### 3. *Even the complete omission of an element can be harmless under appropriate circumstances.*

---

[68] *Jimenez v. State*, 32 S.W.3d 233, 237-38 (Tex. Crim. App. 2000).

[69] *Id.* at 238.

[70] *United States v. Marcus*, 560 U.S. 258, 263 (2010).

[71] *People v. Davis*, 509 Mich. 52, 73-76 (2022) (recognizing "a formal rebuttable presumption" in the plain-error standard for forfeited structural errors).

*Prystash v. State*[72] illustrates how a missing element can easily be found harmless. In *Prystash*, the defendant was convicted of capital murder and sentenced to death.[73] The jury charge at the guilt stage included an instruction on the "intent to promote or assist" theory of the law of parties but did not include the conspiracy-liability theory of the law of parties.[74] Because the guilt-stage jury charge included the law of parties, the Texas statutory scheme required that the following "anti-parties" special issue be submitted:

> whether the defendant actually caused the death of the deceased or did not actually cause the death of the deceased but intended to kill the deceased or another or anticipated that a human life would be taken.[75]

At the urging of defense counsel, the trial court omitted the "anti-parties" special issue from the jury charge.[76] The Court's opinion found that the defendant had invited error and, so, was estopped from complaining about the omission of the special issue.[77]

But in her concurring opinion, Judge Keller pointed out that there was also no harm.[78] The anti-parties issue serves an important function if the guilt-stage jury instructions include the conspiracy-liability theory of the law of parties because that theory does not require the defendant

---

[72] 3 S.W.3d 522 (Tex. Crim. App. 1999).

[73] *Id.* at 525.

[74] *Id.* at 540-41 & n.4 (Keller, J., concurring).

[75] *Id.* at 529 (Court's op.).

[76] *Id.* at 529-30.

[77] *Id.* at 531-32.

[78] *Id.* at 537-41 (Keller, J., concurring).

to possess an actual anticipation that a human life will be taken.[79]  But the "intent to promote or assist" theory does require the defendant to possess such actual anticipation—and in fact requires a showing of intent to kill.[80]  So the guilt-stage jury charge required the jury to find everything needed to answer the anti-parties special issue "yes," making the omission of the anti-parties special issue harmless.[81]  *Prystash* shows that a jury charge in one stage of the trial could make harmless the failure to submit an entire issue at a different stage of trial.

*Martinez v. State* points to another way in which the entire omission of an element can be harmless—the verdict forms.[82]  Suppose causation had been omitted entirely from the second theory of murder in Appellant's jury charge, but the charge had also included a separate verdict form for each theory of murder and the jury had found Appellant guilty under both.  Because there was only one murder count (and because, in any event, the two theories are merely alternative means of committing a single murder), the trial court would have been obligated, under *Martinez*, to sentence Appellant for only one murder offense.[83]  But a jury answer of guilty on both verdict forms would

---

[79] *See id.* at 541 n.4 (quoting TEX. PENAL CODE § 7.02(b)) (requiring that the charged offense "should have been anticipated" during a conspiracy to commit another offense).

[80] *See id.* at 540-41.

[81] *Id.* at 541.

[82] 225 S.W.3d 550, 555 (Tex. Crim. App. 2007) (More verdict forms than counts were submitted to the jury, but the multiple verdict forms did eliminate any jury unanimity problems that might otherwise have attached to submitting what amounted to multiple offenses as part of the same count.).

[83] *See id.* ("The mistake the trial judge made here was in rendering judgment on all of those counts. . . . Once the judge receives the jury's verdicts, he should perform the task of deciding what judgment is authorized by those verdicts in light of the controlling law, the indictment, and the evidence presented at trial.").

have rendered harmless any deficiency with respect to the second murder theory. In that situation, we would know, without any doubt, that the jury found Appellant guilty under the *first* theory of murder, all of the elements of which were included in the abstract and application paragraphs.

Even Justice Scalia, upon whom the concurrence relies, did not completely eliminate a harm analysis for an omitted element:

> Insofar as it applies to the jury-trial requirement, the structural-error rule does not exclude harmless-error analysis—though it is harmless-error analysis of a peculiar sort, looking not to whether the jury's verdict would have been the same without the error, but rather to whether the error did not prevent the jury's verdict. The failure of the court to instruct the jury properly— whether by omitting an element of the offense or by so misdescribing it that it is effectively removed from the jury's consideration—can be harmless, if the elements of guilt that the jury did find necessarily embraced the one omitted or misdescribed.[84]

**F. Evaluation: Reasons 1 and 2 actually demonstrate that Appellant suffered no harm, even under the most lenient standard, but even if that were not true, these reasons definitely demonstrate that he suffered no egregious harm.**

Even if we used the most lenient harm standard available to Appellant—the constitutional harm standard that requires showing beyond a reasonable doubt that the error did not contribute to the defendant's conviction[85]—the omission of the causation element from the application paragraph would be harmless. The clear and concise abstract paragraph includes the causation element, and aside from the difficult-to-read application paragraph, everything else in the jury charge points to causation as an element. There is even authorizational language that would require the jury to give effect to the abstract paragraph and an instruction not to disregard any of the instructions (e.g., the abstract murder paragraph) and not to place special significance on any instruction (e.g., the

---

[84] *Neder*, 527 U.S. at 35 (Scalia, J., dissenting).

[85] *See* TEX. R. APP. P. 44.2(a).

application murder paragraph). Moreover, the State told the jury that causing death was an element of the second murder theory, and jurors in general already know that causing death is an element of murder. In fact, a claim that murder did not require causing death would be surprising to, not only the average juror, but probably *any* juror. Not only would such a claim be totally counterintuitive, but it would contradict other instructions in the jury charge and what the prosecutor said. This jury was not shy about seeking guidance from the trial court. If this jury really believed that the application paragraph was susceptible to this counterintuitive reading, and if it thought that counterintuitive reading might affect its decision, it would have sought the trial court's guidance. It did not.

And even if the jury had thought the causation element was missing, the other elements the jury was required to find would have required it to find causation anyway. To convict under the application paragraph, this jury would have to believe that Appellant strangled or suffocated the victim severely enough to create a substantial risk of death and that Appellant in fact intended this severe injury. This would entail not only finding that Appellant's conduct created a substantial risk of death but also that the inflicted injury created a substantial risk of death. Having found that the inflicted injury created a substantial risk of death, the jury could not find that Appellant's conduct was clearly insufficient to cause death under medical evidence that was at best ambiguous and at worst highly incriminating.

And supplementing both of these two main reasons is the fact that the "sudden passion" issue at the punishment stage clearly indicated that the jurors should have already found causation. The jurors actually sent the trial judge a note about sudden passion but said nothing about the causation language—suggesting that they were not at all surprised by it because they had in fact found

causation.

But even if one thought that the reasons for the application-paragraph omission being harmless did not quite rise to the confidence level of beyond a reasonable doubt, that is not the standard here. Appellant forfeited the right to an analysis under the constitutional harm standard by failing to object and is relegated to the statutory egregious-harm standard for unpreserved jury-charge error.[86] Unlike the lenient "beyond a reasonable doubt" standard, the "egregious harm" standard is a difficult standard to meet.[87] It is on the far end of the harm spectrum from the constitutional harm standard for preserved errors. And since, at worst, the harm question is close under the constitutional standard, it is no-brainer that egregious harm has not been shown.

I respectfully dissent.

Filed: May 7, 2025

Publish

---

[86] *See Jimenez*, 32 S.W.3d at 236-38.

[87] *See supra* at n.2.